2. When the yellow light comes on on the podium, you have two more minutes in your argument. When the red light comes on, we ask you to conclude your argument at the earliest, basically conclude it, unless the court is asking you a question. Also, we have read the briefs and record excerpts. We have not necessarily read the entire record before oral arguments, so we appreciate record citations when those are appropriate. With that, the first case of the morning is number 20, 50221, Berkle v. Major Patrick, now deceased, and others. May it please the court, good morning. Sam Brando. I'm a professor and supervising attorney in the Tulane Civil Rights and Federal Practice Clinic. I rise to introduce the student attorneys Ruthann Reeves will present our principal argument, and Olivia Nielsen will handle the rebuttal. All right. Thank you very much. May it please the court. Over a hot weekend in July of 2017, appellees locked my client, Mr. Berkle, in a shower cell and deprived him of food, adequate drinking water, medical care, and basic sanitation for 30 hours. Accordingly, we respectfully request that this court reverse and remand for trial, because the district court committed reversible error by granting summary judgment when material factual disputes remained in the record, by holding that appellee's conduct was not a violation of Mr. Berkle's Eighth Amendment rights, and by holding that this court's jurisprudence prohibiting appellee's conduct was not clearly established in 2017. First, the district court erred by granting summary judgment when material factual disputes remained in the record. The district court order spends a lot of time with deliberate indifference of each of the appellees, but it held that there was no evidence or that the bulk of the evidence was that the appellees had no knowledge or no reason to believe that Mr. Berkle was in danger or that there was a substantial risk of harm to his health when he was locked in the shower for 30 hours. To the contrary, the record contains numerous and varied evidence that each of the appellees were aware of and had a duty to change the conditions that Mr. Berkle was being held in for that 30 hours. What is your best showing that each one of the appellees knew what was wrong with Berkle? Yes, Your Honor. That would be in Mr. Berkle's declaration. That's ROA 256-261. In the beginning and in his verified amended complaint, that's ROA 110-111. It's clear from Mr. Berkle's statement that there were five appellees that were present when he was locked in the shower and first left there, that he had a documented heat restriction, that he was vulnerable to heat and humidity, and that he could not be left in the hot and humid shower cell over the weekend as Major Patrick ordered. I have two questions. Does the characterization of the shower as a dry cell change the analysis, and weren't the heat restrictions only applicable to his work assignments and not necessarily his residential assignments? I'll start with your first question. I think that the shower cell obviously adds a different layer than a dry cell procedure. In the record, the dry cell procedures are at ROA 184-190. Those require that Mr. Berkle be given food consistent with those provided in the dining halls, that he be given adequate drinking water, and drinking water whenever he requested it, that he be given a bedpan and a mattress and a blanket as requested. In this case, the shower cell was not dry at all. In fact, it did not serve the penological purpose of a dry cell because there was a shower head operating within the cell and the drain was not closed as required to serve the purpose of dry cell, which is to prevent the destruction of contraband. In addition, the shower cell is cramped. Mr. Berkle is in a small shower that's enclosed, and it's different from a housing cell. Additionally, I'll go to your second question. There is no housing restriction for heat, but if you look at the housing restriction, I'm sorry, that's at ROA 337, there is no checkbox for heat restriction for housing. There is only a checkbox for single level or barrier-free housing restrictions. In the work assignment restrictions, there is a heat restriction, there's a humidity restriction, there are various options available for restricting the work assignment. We think that is relevant to the consideration of whether his heat restriction was not only for work because it only applied to when he was working. It was only for work because that was the only option that he had for the heat restriction to apply. There was only one checkbox for that. Right. There is no checkbox for heat restriction or humidity restriction under the housing assignment. That's not an option. In fact, Mr. Berkle's heat restriction is based on the medication that he takes, and you'll find in the record, I'm sorry, at ROA 371, that his prison medical providers informed him that excessive heat and excessive humidity could be life-threatening for him, and that he should avoid those conditions because of the medications that he was taking. That's repeated throughout his prison medical record that heat is dangerous for him specifically. Of course, he was examined by the doctor or medic shortly after this incident, and he was fine. He was examined on the 3rd, the 5th, the 6th, the 7th, and the 9th of July, I believe. After being released on the 2nd. There is one record that says, he says, I'm okay, to the provider. You'll find in Mr. Berkle's declaration, I'm not exactly sure what page that is, but it's paragraph 56 of his declaration, that he was uncomfortable with the medical provider sent to him on that day, and that he specifically told that provider that he was fine, so that they would leave him alone, essentially, and again, you'll find that in his request for medical help on, I'm sorry, on July 5th at ROA 333, that he requested medical help for continuing heat injury symptoms, including nausea and dizziness, and that he requested again on July 7th, a medical visit, and then a request on July 9th for a medical and mental health visit because he was experiencing some mental health. Did a doctor ever find him having problems? The doctor spoke with him after, I'm sorry, that would be on July 6th, about avoiding heat and humidity to kind of, and drinking plenty of cool water to kind of recover from the heat-related symptoms that he was having. However, this court has previously in heat-related cases found that heat injury and the dangerousness of heat is that it comes on quickly, and that there is not always a previous injury or a later injury, that heat symptoms and heat-related injuries come on quickly, and then once Mr. Burkle was revived from being unconscious on the shower floor at the end of this by, I'm sorry, Officer Winkfield, he was revived with ice water. He's given food and ice water and removed from the hot and humid shower cell, and so he's revived. He was not suffering in those conditions any longer, but that does not change the fact that while he was there, he was, he twice fell unconscious. He was experiencing those severe heat-related injuries while in the shower cell. So which of, if we were going to only reverse this to one, and I'm certainly not saying that's what we would do, which one of the appellees do you think was the worst? Officer Wheeler, I believe, was, I would argue, was the worst because he was present during the interrogation. He heard Major Patrick's order that Mr. Burkle not receive food, drinking water, or medical care or anything during the time, and Major Patrick gave that order for Mr. Burkle to not receive food or drinking water. Why isn't Patrick the worst? Patrick, it's contested in the record, Patrick denies that that's the order that he gave, and that's a finding in the prison investigation, and that's in the initial interviews, that Major Patrick said, don't give him anything, and that the officials misinterpreted that order, and Officer Wheeler was present for the order, and he was also the only one that was present in the building when the order was given, when Mr. Burkle said that he had the heat restriction, and then throughout the night. Isn't that a factual question? I mean, so if Patrick said, don't give him anything, then he's the one that's, and I'm sorry that he's passed away, but he's the one that's the worst. The prison officials' duty to ensure the safety of Mr. Burkle, Major Patrick gives the order, and then he leaves. Officer Wheeler and Officer Snyder are present to hear Mr. Burkle's cries for help, requests for water, requests for medical care. Now, wait a minute. He was in a shower. Correct. You turn on the shower, you drink water. It is correct that he had access to water from the showerhead. However, it is uncontested in the record that that water was, that he was not able to adjust the temperature of that water, and it is in the record that it was hot, and it came out too forcefully, increasing the heat and the humidity in the enclosed shower cell. But he was not unable to hydrate. He was, he did have access to some water. However, the district court erred by failing to consider this court's precedent from Gates, from Ball, from Webb v. Livingston, from Hinojosa v. Livingston, that lukewarm or hot water, as this court held in Ball, that water temperature, shower temperatures between 100 and 120 degrees Fahrenheit were not a sufficient heat mitigating measure because they did not mitigate the heat conditions, and they did not mitigate the extreme temperatures. So while he did... Which case talks about the exact water temperatures? I believe, I believe that's Ball v. LeBlanc, but I can double check that for you. Okay, let me ask you a more technical question, and that is, how do you, how do you intend to proceed against Officer Patrick's estate at this point in time? I will represent to you that we intend to file a motion to substitute in the trial court to substitute Major Patrick's estate. Well, but under Texas law, I think you have to file a claim against an estate within a certain period of time, and I don't know if there, I'm just, have you, maybe this was such a surprise that you haven't had a chance to run it to ground yet, but I'm just wondering from our perspective, are we going to be notified at some point in the near future that there is indeed still a live case against Patrick's so that we have to decide it live, so to speak? We are still kind of exploring our options as far as the substitution of Major Patrick's estate for Major Patrick within the case. We can file a supplemental briefing if the court wants it regarding... I think you need to advise us about it. It doesn't have to be a brief. It can be a letter or preferably a brief letter to the clerk's office when you've done whatever you're planning to do. Yes, Your Honor. When they sent the notice shortly, a short time ago, was that the first you knew of it, of his death? I think there was some slight mention that maybe that had occurred previous, but I'm that we would need to substitute a party. Okay, what is your best case on the notion that this was clearly established for qualified immunity? Because that's really your hard part. If qualified immunity didn't exist, you probably wouldn't have lost the summary judgment, but qualified immunity is a tough one to get past, so what's your best case on that? Our best case on that is Hinojosa v. Livingston, where this court held that the right to be subjected to extreme temperatures without adequate heat relief measures is clearly established in this circuit based on a wealth of cases from this circuit regarding heat and extreme temperatures. In addition, the district court erred by finding that Mr. Burkle did not sustain any injury and applying a lasting harm injury standard. This court in McCord v. Maggio found that being subjected to pain, suffering, and mental anguish is all that's required to prove an injury, and that there is no requirement for lasting harm. And this court in Blackman v. Garza, which is unreported, found that headaches, nausea, blurred vision, and similar symptoms to those that Mr. Burkle suffered was sufficient to allege a more than de minimis injury as required to recover damages by the PLRA. Returning more to Judge Doudon's question about the water and the heat, the district court also erred by failing to consider the mutually enforcing effects of locking Mr. Burkle in a shower when it was hot and humid and the shower was, as the record contests, poorly ventilated and providing him only with hot water. This court has found in Gates and Palmer v. Johnson and multiple other cases that two conditions can combine to have a mutually enforcing effect to deprive a person of a single identifiable human need. In this case, the heat and the conditions within the shower cell and the hot water that came out forcefully, Mr. Burkle expressed concerns about it washing his waist and vomit around the cell where he was also forced to sleep, had the mutually enforcing effect of depriving him of his Eighth Amendment rights. We request that this court reverse and remand to the trial court for further proceedings. Thank you. All right. Thank you. Ms. Nielsen will have a chance for rebuttal. We'll hear from Mr. Kalb. May it please the Court. My name is Michael Kalb. I'm an Assistant Attorney General for the State of Texas, and I represent appellee's defendants in this case. Through this lawsuit, Plaintiff Jonathan Burkle, a Texas State inmate, argues that his conditions of confinement from July 1st to July 2nd, 2017 violate the Eighth Amendment. The district court granted defendants motion for summary judgment and dismissed the case with prejudice. We now ask that you affirm for two reasons. First, there's no evidence of an Eighth Amendment violation, and second, Burkle has not met his burden of overcoming defendants' qualified immunity. I will now address each of these reasons in turn, beginning with the merits of his Eighth Amendment claim. To establish his conditions of confinement violated the Constitution, Burkle must meet an objective test and a subjective test. Under the objective test, he must show that his conditions were sufficiently extreme so as to deprive him of the minimal measure of life's necessities. And under the subjective test, he must show that defendants acted with deliberate indifference to those conditions. Burkle does not satisfy either test. Prison conditions can be restrictive and even harsh without violating the Eighth Amendment. The conditions must shock the conscience and deprive the inmate of a basic human need. Now, my friend on the other side just argued that the combination of heat exposure, food deprivation, mattress deprivation, and unclean living conditions together violated the Eighth Amendment. This is a misapplication of the law. The combination of prison conditions can only establish an Eighth Amendment violation if all of the individual conditions deprive the inmate of the same basic human need. For example, if an inmate is deprived, sorry, if an inmate is exposed to both insects and mold, those both arguably deprive him of hygiene. This is not the case here, however. Food, comfortable sleep, clean living conditions, and respite from heat are individual human needs. Therefore, the Court cannot consider the combined deprivation of these needs in determining whether Burkle's condition More deprivations? We're not supposed to consider that? Only if they give him one? No, Your Honor. The individual conditions can be combined if they all have a mutually enforcing effect of depriving the inmate of the same human need. But he's saying he didn't have any water that he could actually drink because I think we've all been in a shower that's a little too hot, and we know what that feels like. You certainly don't try to drink that water. You're trying to get out of that shower or turn it down or do something, and he wasn't able to for 30 hours, and that's not a problem? Your Honor, that's with respect to one of his conditions, which is he alleges that he did not have access to drinking water. My point is that you can't consider that plus the food deprivation, plus the heat exposure, plus the mattress deprivation together. At least the lack of water and the heat exposure would have a mutually effect that you're discussing right now. Your Honor, that may have been the case if, in fact, he had not had access to drinking water. As Your Honor mentioned during the previous argument, it is entirely possible for an inmate to drink shower water. Maybe not ideal, but possible. But not if the shower water is too hot, and that's his argument. Now, obviously a jury might totally find what he says is a lie or something, but that isn't our issue. Our issue is we have to accept his facts, and he's saying the water was too hot. And you know what that—I mean, I know. I've been in a shower that I certainly wouldn't have drank. I was trying to figure out how to get it to be not so hot. It was bursting on me, and that's for two seconds, not 30 hours. I understand, Your Honor. In this case, the district court correctly found that it was implausible that he had no ability to drink the water. I've been in a hot shower. If I had to drink the water, I was very thirsty. I would cup it in my hands, wait for it to cool off, and then drink it. He also could turn the water on very briefly, for two seconds, just to grab the water, enough to drink, and then turn it off. He didn't have to keep it on, which would have raised the temperature in the cell, or drink it directly as it was coming out of the spout. Did he get food? During the 30 hours? No, Your Honor. That's what he alleges. I thought I saw something about how they did offer him something. That is contested. So for the purposes of summary judgment, we have to assume his version of events, which is that he did not have any food for the 30 hours. Well, I mean, wait a minute. This is summary judgment, not dismissal on the pleading. So your side could have offered evidence, I suppose, right? The problem is there's no document that would show whether or not he received food. He alleges that he did not. Our clients allege that he did. All right. You don't have evidence. Right. So presuming that he did not have food for 30 hours, that is still not a constitutional violation. Was this an adequate dry cell, and does that change the analysis at all? No, Your Honor. It was not an adequate dry cell in the sense of the policy violation. However, a policy violation does not equal a constitutional violation. And in addition, the fact that it was meant to be a dry cell from the perspective of defendants does change the analysis and is important for the purposes of establishing deliberate indifference. There is no dispute that all of the defendants believed when they placed him in the shower cell and kept him in the shower cell and or deprived him of various things in that shower cell that he had ingested a large amount of drugs. He had swallowed balloons full of drugs. And he was in that shower cell for the purpose of removing those drugs from his system. That was why they all believed that he was in that cell. Was there any way to test for whether he actually did take down those drugs in his body besides just throwing them in this place and waiting for it to get itself out? I know, Your Honor, that this court has upheld the dry cell procedure in a Garcia case and held that basically whether or not it is the optimal measure of— the optimal way of getting these drugs out of his system or knowing whether they're there in the first place. But that's the question to me, the knowing, because he's denying that, that he had at that time. Not that some other time he might have had it, whatever. And I understand this is difficult because this is a prison, so I understand the difficulty of that. But if he didn't have it, is there any way to establish that so he doesn't get stuck in this place? So in this case, he was alleged to have ingested or to have swallowed a balloon full of drugs. It's not as though they could have done a toxicology screening to see whether or not he had them in the system because they would not have shown up. The purpose of the dry cell was to get the balloon out of his system or at least see if it's in the system. That's why there's a durational limit to how long he could have been in that cell. It would have been 48 hours, at which point they would have had to remove him for the policy. In fact, he was in there far less than that because after 48 hours, if the balloon full of drugs was not uncovered, the presumption is that he had, in fact, not ingested them. Okay, so every time somebody visits him, he's going to be thrown in this place for 48 hours and treated this way just because somebody visited him? Your Honor, it's not just that he was visited. It's that during the visit with his cousin, he was observed swallowing a balloon full of a green leafy substance. That is a very serious allegation in the prison context. Those drugs could be spread throughout the prison. They could have been ingested by Burkle, causing an overdose. It is something that they want to prevent at all costs. Therefore, when that sort of allegation is lodged, the dry cell procedure is initiated, pursuant to which an inmate is placed in a cell for the purpose of uncovering whether or not he had ingested those drugs. Now, in this case, that procedure was not followed precisely. We admit that. However, that doesn't matter because the purpose of that policy was in the minds of the defendants when they placed him in that cell and kept him in that cell. On the other side, it said the purpose was not served because there was a drain inside of the shower, and so it did not serve the purpose. Your Honor, for purposes of establishing deliberate indifference, that's a subjective standard. What matters is what was in the minds of the defendants when they placed him in that cell and kept him in that cell. The point, well, but what Judge Douglas is saying is, to put it more concretely, if he had expelled something, it could have gone down the shower, but not if it's a balloon, I suppose. The effectiveness of the specific way that they implemented it... But that's not... Oh, right, you're just saying that hasn't been looked at yet. I think, ultimately, for purposes of summary judgment, it doesn't matter because the defendants all believe that he ingested these drugs. Sorry, Your Honor. No, that's okay. In your brief, one of your briefs, it says, Berkel was in the 11-building shower from 12pm on July 1 until approximately 6.20am on July 2, when he was moved to another cell. And then they say he was in the shower for approximately 30 hours. So I guess instead of 12pm, you mean he was put in the shower at midnight on 12am on July 1? It was pm. It was after the visit, 12pm. However, there's a dispute as to whether or not he was in the cell for approximately 19 hours, which is what defendants claim, versus 30 hours, which is what Berkel alleges. And for the purposes of... Because there's no evidence, you know, concretely, just to explain when he was removed, for purposes of summary judgment, we will accept that he was there for 30 hours. Your Honor, if I could move on just to... Well, I want to ask about Patrick. I'm sorry that he has passed away. What is the situation on that? So as of now, the Office of the Attorney General does not represent the estate. Now the estate has the option of electing to have OAG representation, Office of the Attorney General representation, but they have not done so yet. We will reach out to them if, in fact, we find out that there is an estate, which is not, you know... It could be in public records. That's our next step. But there has to be an executor, at which point they would have to elect to have our representation, and we would then move forward. However, there needs to be service on the estate by Mr. Berkel, and there has to be, you know, the notice given to the court, as Your Honor's mentioned, that they intend to proceed against the estate. Because as of right now, Mr. Berkel is deceased and is not a party. However, we will vehemently defend the summer judgment ruling because as an ethical obligation to a deceased client, we must. However, until the estate has been sued or added, substituted in as a defendant, we will not represent the estate. But you only recently told them, told the opponent, that he had died. Yes, Your Honor, and therefore... You only recently told us. Correct. And that is only because the Office of the Attorney General was not made aware until a few days ago, at which point it was immediately brought to the court's attention. And there is a certain number of days under the federal rules of civil procedure that plaintiff can elect to substitute in the estate, and we will cross that bridge when we get to it. Okay. So moving on to the deliberate indifference piece, which I touched on earlier, it's really important that the defendant-by-defendant analysis takes place. It can't be lumping them together, and the district court did a good job of that and found that none of the defendants had acted with deliberate indifference. Now, Patrick, when he placed Burkle in the cell, believed that he had ingested a balloon full of drugs. He also knew that there had been a medical examination that had just taken place that had cleared Burkle for dry cell and found no reason why he couldn't have been in that cell. He also had no heat restrictions except for a work restriction, which, it must be noted, is very different from a living restriction. A heat restriction in the work context takes into account the exertion that one uses during work. He is, you know, presumably walking. It could be outside. It could be lifting heavy machinery. It could be various things that have to be taken into account in addition to the actual temperature, whereas in this cell, for a living restriction... Is this a jail where you are stuck in your cell, or are you able to leave normally? Are you able to leave your cell and go outside and things like outside within the prison, or is it something you are stuck in for, like, 23 hours and then only put outside for an hour? Your Honor, that would entirely depend on the custody status of the plaintiff at various... Yeah, I'm asking about this prison. Yes. Oh, so it's actually individual to the inmate. So this prison absolutely had various custody statuses, including general population inmates who could go out and, you know, be on the yard and have prison jobs and move throughout the unit relatively freely, but also individual inmates who, because of disciplinary infractions or other reasons, would be restricted to a cell. And what about him? He, at the time before this, had a general population... OK, so he was not stuck in a cell for 30 hours, generally. Correct. That's different from this situation. Correct, Your Honor, which is why there is a medical examination that takes place immediately before placing an inmate in this type of environment, and he was cleared, as I mentioned. Now... But did the doctor say, oh, you don't have to give him any... He doesn't have to have water for 30 hours. Oh, you don't have to give him any food. Oh, you can put him in a cell that's not a dry cell. Oh, did the doctor say all that? No, Your Honor. OK, so that's the problem, right? The... The effects of those conditions were minimal enough that it doesn't matter whether or not he was cleared. The cleared medically piece is only relevant to the heat restriction. The fact that he was in a hot cell... All of the cells in that entire block in the prison, for that matter, except for certain respite cells, are air-conditioned. They're hot cells. You know, his cell in general population was also hot. It was also the same temperature. The only difference was that this was a shower and that when he turned on the faucet, it may have risen the temperature slightly for the time he had it on. Now, again, he had full control over the shower. He didn't have to turn it on for long enough... for more than it took to take a quick sip of water. He also alleges in his affidavit that it was 91 degrees. However, he produces no basis for that knowledge. It is a number that was thrown out in his... Well, it was July, so 90 is probably conservative. Even assuming it was 91 degrees, Your Honor, he admits that it did cool down at night substantially, at which point it would have been a good time for him to turn on the water, to have a quick sip of water. But right now we're looking at the deliberate indifference piece, which I think is very, very important for this case, especially when we look at the other defendants. You know, Harvey and Atlam were only present when Burkle was placed into the cell originally. They left at that point. They went back to other duties in the unit and had no reason to know how long Burkle would be in that cell. They didn't know how many meals he would be deprived of. And from their perspective, there's no evidence that they had deliberate indifference to the actual conditions in this cell for the period of time that he was subjected to them. And that's even more true for Snyder and Wheeler, who Snyder, who my friend on the other side said, was the most culpable defendant. They were only in the area for the first five hours that Burkle was in that cell. They deprived him of one meal, after which time their shift ended and they went home. They had no reason to know how long these conditions would persist. As for Hahn and Brooks, who were the only two remaining defendants, they worked the overnight shift. They had knowledge that he was deprived of one meal over the overnight shift. And then they went home. So none of these defendants had full knowledge of the extent of the deprivation as alleged by Burkle. And therefore, that must be taken into account when considering whether or not they were deliberately indifferent to these conditions. Now, to prove deliberate indifference, Burkle relies heavily on the fact that a policy was violated. And we can see that a policy was violated. That's true, but that does not mean that it violated the Constitution. The Court has been very clear about that. Williams v. Banks, among other decisions, have held that. I'd like to move on finally to qualified immunity, which Your Honor mentioned is the issue in this case, the most important issue, and that even if the Court concludes that there was an Eighth Amendment violation, defendants would still be entitled to qualified immunity because they acted reasonably in light of clearly established law in 2017. It was not beyond debate in 2017 that depriving an inmate of four meals over 30 hours violated the Constitution. This Court held in Thomas v. Owens that the denial of five consecutive meals did not violate the Constitution. This Court held in Guzman v. Owens that the denial of food for 19 hours did not violate the Constitution. And it is plaintiff's burden to find case law that shows that this level of deprivation was a constitutional violation at that time, and they have failed to do so. All of the cases they cite are either out-of-circuit precedent that are not relevant or were decided after 2017. For example, Taylor v. Riojas is a case they rely on substantially. However, that is a case that had substantially different facts and was decided in 2020, or which dealt with vastly more extreme situations and extreme deprivations in the cell. For example, Cooper v. Sheriff, which they cite repeatedly, is a 12-day food deprivation. That is very different than 30 hours. Second, it was not beyond debate that denying an inmate drinking water for 30 hours violates the Constitution, whereas here the inmate had access to running water from a shower. Third, it is not beyond debate that denying an inmate a mattress for one night violates the Constitution. In Novak v. Beto, this Court held that two-week mattress deprivation did not violate the Constitution. Surely one night would not under that precedent. Fourth, it was not beyond debate that housing an inmate in a hot cell for 30 hours violates the Constitution. My friend on the other side mentioned Hinojosa v. Livingston. That is a case in which the inmate died from prolonged, weeks-long exposure to heat. That is a very different set of facts than we're dealing with in this case, Your Honor. Also, Ball v. LeBlanc, where there was months-long heat exposure, and Blackman v. Garza, where there was prolonged heat exposure. And in that case, the guards turned up the heat in a way that was clearly meant to be vindictive to the words of the inmate. Whereas here, it's very clear that none of the defendants, and this is sort of going back to the deliberate indifference piece, none of them had any ill will towards, there's no evidence of any ill will towards Burkle. Well, he had some evidence of Patrick making some remarks to him that, luckily, were not particularly friendly. Sure, Your Honor. The primary remark was that I'll see you on Monday. I'll come back on Monday. That was the primary remark. It's very different than the type of remarks that were seen in... No, I thought that he asked, I thought he asked to be removed and there was a comment that was kind of nasty. I would argue that those comments are very different than the type of comments that were alleged in, for example, Taylor, where there was a, you know, basically saying, I hope you freeze in there. You know, I basically throwing him in without, throwing away the key. But that's not, I want to go back to the, that's neither here nor there. I want to, I'd like to go back, because I am running out of time here, Your Honor. I'd like to go back quickly to the last two points for qualifying immunity, which it is not beyond debate that holding an inmate in the presence of his own feces and vomit for one night violates the Constitution. This case held in Garcia v. Curry, which is the case law that this court upheld the dry cell policy, they held it 44 hours in a dry cell with no way to clean feces, was not a violation of the Constitution. In Davis v. Scott, this case, this court held that exposure to feces and blood for three days did not violate the Constitution, where the inmate had access to running water. And I see that I'm out of time, Your Honor, so I'll just close by saying that there's no relevant case law in 2017 that would have placed these defendants on notice that their conduct violated the Constitution. And because of that, FERCLA has failed to overcome defendants' qualified immunity. And for all these reasons, this court should affirm the district court's order granting defendant summary judgment and dismissing FERCLA's lawsuit with prejudice. I have one question, Mr. Kalb. Are you in the SG's office or in the OAG? I'm an assistant attorney general, Your Honor. Okay, great. Thank you. Thank you. Ms. Nielsen. May it please the court. I think an important thing to remember here when we talk about the fact that this is a totality case is that all of the mutually enforcing factors that we mentioned combined to increase Mr. Burkle's heat-related injury. So the fact that it was a 91-degree day and he didn't have any cool drinking water, people die without drinking water and temperatures less than 90 degrees. So that contributed to his heat-related injury. And it's the same with the fact that he was denied medical care after requesting it numerous times. He had made it known that he was in distress and the appellees denied him medical care as he was entitled to under Estelle v. Gamble. And so when we mention the totality, we just mean that all of these factors made his situation increasingly miserable in the extreme heat conditions. And then another point I want to address is the food. Appellees mentioned that there was, I believe the wording was something about how he was denied food and, or no, they said it was uncontested. So basically, or excuse me, I misspoke. So what is contested is the three versus four meals. It is uncontested that Mr. Burkle received no food during this ordeal and that is, I believe, on page 195 in the record. That is a prison memo from the appellees. And so the contested part is just the amount of meals that he got. And so just to clear that up. And then in addition- Or how many he missed is what you're saying. Precisely, Your Honor. And another point is that no drugs were found. That is clear in the record. And the case- What does that have to do with, I mean, their argument is they thought he did have the drugs. Right. And that could happen in a prison. It could happen with this person. And so what is the evidence that he didn't have the drugs? Certainly, Your Honor. So we- I mean, before they put him in. Yes. So Mr. Burkle was strip searched before he was put into the shower. And that is also on page 195. That is the same prison memo that I mentioned previously. And the case Garcia, the inmate actually was X-rayed. And so they knew that he didn't have drugs. In this case, Mr. Burkle was not X-rayed. And so there was nothing to definitively prove, you know, what happened. If he had swallowed the balloon, would the X-ray have shown that? Your Honor, I am not a medical expert. So I don't know if the X-ray would have shown that. But all I can really say on that matter is that the record is clear that no drugs were found. That's a Monday morning quarterbacking to say the drugs were not found. I mean, that's after the fact. We have to look at it from the perspective of what happened before he went in, not after he came out. Yes. Definitely, Your Honor. Although we would also argue that whether or not he had drugs is not material to whether a constitutional violation still existed. The record shows that every staff member... But they absolutely knew he didn't have the drugs and put them in there. That really would be a problem. But the question is, what could they have done differently to see if he had the drugs? Or what should they have done differently that there was clearly established? Yes, Your Honor. I think that... One is they should have put him in a dry cell, not this. Yes, I think that what they should have done differently overall would have been to just make sure that he had his basic entitlements and adequate provisions. If they did suspect that he had drugs, the most obvious thing to do would have been to still follow dry cell procedures and give him water and give him food consistent with the rest of the prison per dry cell procedures and to check on him and give him the medical relief that he requested and not ignore his repeated request through the intercom for water and help. That is what we believe they should have done differently. And so because of the repeated times in the record that he cried for help, I believe it's about 16 times I counted through the pages of his declaration, 256 to 260, there's enough evidence there for a jury to find that the defendants knew Mr. Burkle was in distress and were deliberately indifferent to it. And the district court erred by not crediting his testimony as well as by deciding that there was no evidence of deliberate indifference. And so to conclude, even the district court admitted that this case contains considerable factual disputes and all of these things impact a finding of deliberate indifference and qualified immunity at trial. So we are not asking for this court to decide those issues. We're just asking for a trial. So respectfully, we request that this court reverse in remand. Thank you. All right. Thank you very much. We have the argument.